# United States District Court

_____WESTERN_____ DISTRICT OF _____TENNESSEE_____

UNITED STATES OF AMERICA

V.

**TERRANCE LASHUN HARRIS,**

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: *06 M J 245*

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about_March 2 , 2006_ in _Shelby_ county, in the _Western_ District of _Tennessee_ defendant(s) did, (Track Statutory Language of Offense)

attempt to possess with the intent to distribute at least approximately six kilograms of cocaine, a Schedule II controlled substance,

in violation of Title 21 United States Code, Section(s) 846. I further state that I am a(n) FBI Special Agent Bryan B. Underwood and that this complaint is based on the following facts:

**SEE AFFIDAVIT**

ORIGINAL

**Continued on the attached sheet and made a part hereof.**    √ Yes __ No

_____
**Signature of Complainant**

**Sworn to before me, and subscribed in my presence**

May 5, 2006    8:20 Am
**Date**

Jon Phipps McCalla , U.S. Dist. Judge
**Name and Title of Judicial Officer**

at ____Memphis, Tennessee____
**City**

Jon P. McCalla

**Signature of Judicial Officer**

## AFFIDAVIT

### I.

### INTRODUCTION

I, Bryan B. Underwood, being duly sworn, state that the following information is true and correct to the best of my knowledge, information and belief:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been so employed since July 9, 1990. Previously, I attended the University of Alabama School of Law, and I received a J.D. degree in 1990. I have received training in investigations involving public corruption, drug trafficking and money laundering. I am currently assigned to the Memphis Division of the FBI.

2. I am one of the agents participating in the investigation described in this affidavit, which is attached to a complaint charging Memphis Police Officer Terrance Lashun Harris with attempting to possess with the intent to distribute at least approximately six kilograms of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

3. Because Harris has not yet been arrested and the agents plan to execute a search warrant at his residence, we ask that this complaint be **filed under seal** so that the target is not prematurely alerted to the existence of this investigation and/or the scope and direction of the investigation.

4. I have participated in this investigation, and I have received information about matters relevant to this investigation from, among other sources, conversations with and reports by other Special Agents of the Federal Bureau of Investigation ("FBI"), Special Agents of the Drug Enforcement Administration ("DEA"), Special Agents of the Internal Revenue Service - Criminal Investigation ("IRS-CI"), and Officers of the Memphis Police Department ("MPD") and Shelby County Sheriff's Office. The statements contained in this affidavit are based in part

1    ORIGINAL

on information provided by other investigators assigned to this case, on information provided by informants and cooperating defendants, on information contained in records obtained by the investigators and summaries of records and reports prepared by investigators, and on my own experience and background. I am familiar with the information contained in this affidavit, and the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts contained herein.

5.      Since this affidavit is being submitted for the limited purpose of filing a complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the necessary foundation in order to establish probable cause for the complaint. This affidavit is incorporated by reference in the complaint.

## II.

### OVERVIEW OF THE INVESTIGATION
### AND EVIDENCE ESTABLISHING PROBABLE CAUSE

6.      Harris is a Memphis Police Officer, and he is currently assigned to the Southeast precinct. He has been employed with the MPD since September 29, 1997.

7.      The investigators received information that Harris was involved in distributing narcotics. To follow up on these allegations, the investigators analyzed Harris' financial transactions. The investigators found evidence of expenditures significantly in excess of income from legal sources reported in tax returns and a bankruptcy petition filed by Harris. Harris owns at least one and perhaps two Dixie Queen fast food restaurants. Tennessee and Mississippi property and vehicle registration records show that Harris is the co-owner of property at 4202 Winchester, Memphis, TN (the location of one of the Dixie Queens); the owner of a residence at 8848 Sweet Flag Loop, Southaven, MS 38671; the registered owner of a 2003 Hummer; and the registered owner of a 2001 Chevrolet Corvette. Currency Transaction Reports show that he

2                    ORIGINAL

deposited at least $132,297 in cash (almost three times his annual salary) in a bank account from March through May 2004, and the large cash deposits have continued into 2006. The discrepancy between Harris' reported legal income and his lifestyle expenditures, multiple business ventures and cash transactions indicate that he is involved in some form of illegal activity that generates large sums of cash, such as narcotics trafficking.

8.    To further investigate Harris' activities, the investigators utilized an informant who was acquainted with Harris. Under the investigators' supervision, the informant met with Harris, and the investigators made audio and video recordings of these encounters.

9.    Harris attempted to recruit the informant to participate in a scheme to defraud lending institutions which would be financing real estate purchases. The informant also asked if Harris would assist him in cocaine transactions. Harris readily agreed. Harris paid the informant $5,000 to assist the informant in purchasing three kilograms of cocaine for resale.

10.    In addition, Harris agreed to accompany the informant to deliver cocaine to a purchaser. Harris believed that six kilograms of cocaine were being delivered to the purchaser (who was actually an undercover DEA agent who was receiving packages of sham cocaine).

11.    On March 2, 2006, Harris transferred the packages of supposed cocaine to a bag for delivery to the purchaser, and he also drove the van carrying the supposed cocaine.

### III.

### INFORMANTS' ALLEGATIONS THAT OFFICER HARRIS WAS INVOLVED IN DRUG TRAFFICKING

12.    Law enforcement agents and officers have received information about Terrance Harris' involvement in narcotics trafficking through interviews of jail inmates, narcotics dealers and defendants in criminal cases. The following are examples:

a. On July 12, 2004, MPD Detective T. R. Wilson interviewed an inmate at the Shelby County Jail (CS #1) who reported that Harris sold drugs. According to this informant,

3

ORIGINAL

Harris would come to the house of a relative of the informant and provide CS #1 with crack cocaine. On one occasion, Harris removed crack cocaine from his patrol car and gave it to CS #1. CS #1 also reported that Harris assisted a drug distribution organization in escorting transporters who were bringing cocaine to Memphis.

b. On October 13, 2004, MPD Detective Dion Cicinelli interviewed a different inmate at the Shelby County Jail (CS #2). CS #2 stated that he had been selling marijuana he obtained from Harris. He said that Harris "fronted" the marijuana, that is, sold it to him on consignment. MPD Detective Russ Tilton conducted a follow-up interview of the same informant. CS #2 told Det. Tilton that he had regularly purchased marijuana from Harris and that Harris also sold cocaine to him. CS #2 and Harris had a falling out before the informant was arrested in Fall 2004.

## IV.

## CORROBORATING EVIDENCE OF POSSIBLE MONEY LAUNDERING AND ILLEGAL INCOME

13. To follow-up on the allegations from informants, the investigators examined financial documents concerning Harris and associated persons and entities. These included documents obtained from the States of Tennessee and Mississippi, federal tax returns and tax return information obtained pursuant to ex parte orders, and documents obtained through the use of federal grand jury subpoenas issued to various financial institutions. IRS-CI Special Agent John Rankin has analyzed this information, and the following is a summary of his analysis of financial documents. His analysis has uncovered evidence of expenditures significantly in excess of income from legal sources relating to Harris. Additionally, Harris appears to be laundering significant amounts of illegal income.

ORIGINAL

4

Information about Officer Harris' Reported Employment and Income

14.     An analysis of U.S. Individual Tax Returns (Forms 1040) filed by Terrance Harris showed that he reported modest income:

a. On January 7, 2003, Harris signed a 2000 Form 1040 which was delinquently filed with the IRS. Harris claimed "single" status, listed his occupation as "police," and listed his address on the Form 1040 as P.O. Box 300163, Memphis, TN 38116. Harris reported adjusted gross income of $50,744 on his Form 1040. The adjusted gross income figure was derived from $46,113 in wages that he received from several employers (including the City of Memphis), $3 in interest income and $4,628 in other income.

b. On April 15, 2002, Harris signed a 2001 Form 1040 which was filed with the IRS. Harris claimed "head of household" status, listed his occupation as "police," and listed his address on the Form 1040 as 1463 Pope Street, Memphis, TN 38109. Harris reported adjusted gross income of $43,005 on his Form 1040. The adjusted gross income figure was derived totally from wages that he received from the City of Memphis.

c. On April 15, 2003, Harris filed a 2002 Form 1040 with the IRS. Harris claimed "single" status and listed his address on the Form 1040 as 1463 Pope Street, Memphis, TN 38109. Harris reported adjusted gross income of $42,487 on his Form 1040. The adjusted gross income figure was derived totally from wages that he received from the City of Memphis.

d. On April 15, 2004, Harris filed a 2003 Form 1040 with the IRS. Harris claimed "single" status and listed his address on the Form 1040 as 1463 Pope Street, Memphis, TN 38109. Harris reported adjusted gross income of $28,696 on his Form 1040. The adjusted gross income figure was derived from wages that he received from the City of Memphis and a $19,603 loss from a Schedule C business known as "Secret Services" located at 1463 Pope Street, Memphis, TN.

15.     On November 16, 2005, Harris filed a voluntary Chapter 7 petition in the U.S.

5

ORIGINAL

Bankruptcy Court, Western District of Tennessee (Bankruptcy Petition No. 05-39395). The petition stated the following concerning Harris' financial condition:

a. In the schedule captioned "Current Income of Individual Debtor(s)," Harris reported that his monthly take home pay was $1,960.80, consisting of his police department salary minus deductions. On the Statement of Financial Affairs attached to the petition, Harris reported that his gross income from the City of Memphis was $48,000 in 2004 and $48,000 in 2005, and he reported no other income.

b. In the schedule captioned "Schedule B – Personal Property," Harris reported that he had no cash on hand and only $200 in two bank accounts.

c. In the schedule captioned "Schedule A – Real Property," Harris reported that his real estate holdings consisted of 8848 Sweet Flag Loop E., Southaven, MS 38671 (which he owned in fee simple), and 4202 Winchester Rd, Memphis, TN (which he owned as a joint tenant). He claimed as exempt from the bankruptcy estate the property at 8848 Sweet Flag Loop E. He also identified this property as his address in the petition.

d. In the schedule captioned "Schedule B – Personal Property," Harris reported that he owned a 2003 Hummer and a 2001 Corvette.

e. In the schedule captioned "Schedule E, F – Creditors Holding Unsecured Nonproperty Claims," Harris indicated that he owed franchise fees in connection two Dixie Queens.

Pursuant to Harris' motion in which he represented that he could pay his creditors, the bankruptcy was dismissed on December 22, 2005.

### Businesses and Entities Controlled by Officer Harris

16.    D & A, Inc. is the name on an account at the Bank of Bartlett in which Harris has regularly deposited large amounts of cash. Records from the Office of the Secretary of State for the State of Tennessee shows that a D & A, Inc. was formed on June 21, 2005, for an apparently

6

ORIGINAL

unrelated business located in Middle Tennessee (specifically located in Dickson, TN), and that this corporation was dissolved on December 1, 2005. The Shelby County, Tennessee Clerk's Office does not show a D & A, Inc. as having a license to do business within Shelby County.

17.  Dixie Queen is a chain of fast food franchise restaurants. Harris has told bank employees that he owns two Dixie Queen fast food restaurants, one located at 4202 Winchester, Memphis, Tennessee and the other located on Airways Boulevard, Memphis, Tennessee. 4202 Winchester is also the address for the account holder for the D & A, Inc. bank account in which Harris regularly deposited large amounts of cash. Property records list Harris as a co-owner of the property at this address. Utility records show that utilities at 4202 Winchester, Memphis, Tennessee are listed under Terrance Harris. The Shelby County, Tennessee Clerk's Office does not show a business license for a Dixie Queen at 4202 Winchester, Memphis, Tennessee.

### Evidence of Anomalous Currency Transactions Involving Officer Harris

18.  In 2004, the investigators received a tip concerning suspicious cash deposits by Harris. According to this source, Harris was depositing approximately $15,000 in cash once a week in an account at the Bank of Bartlett. The deposits were all of small denomination bills, and some of the bills have had an odd odor. Harris usually went to a particular teller for the deposits, and when he dealt with other tellers he objected if the tellers requested identification. Harris also told bank employees that he owns a couple of Dixie Queens, presumably as an explanation for the deposits.[1]

---

[1] Profits from the Dixie Queens are an unlikely explanation for the regular large cash deposits. As noted above, Harris subsequently filed a bankruptcy petition in which he reported that his gross income from the City of Memphis was $48,000 in 2004 and $48,000 in 2005, and he reported no other income. In addition, during a recorded conversation with an informant on February 22, 2006 (discussed below), Harris asked the informant how much money he would need to provide to invest in a drug transaction, and Harris advised the informant that, "my money come in spurts." During the same conversation, the informant asked Harris about the Dixie Queens, and Harris replied that they were doing "alright" but that he was having problems with employees stealing from him.

7

ORIGINAL

19.    This tip was corroborated by Currency Transaction Reports ("CTRs") filed for currency transactions conducted by Terrance Harris.[2] From approximately the year 2000 through 2006, thirty-three CTRs were filed concerning Harris and/or D & A, Inc.

a. One CTR was filed on June 9, 2000. The CTR reported that Harris "negotiated an instrument" in order to obtain $12,812 in currency at First Tennessee Bank. The CTR listed Harris as the owner on the transaction and his occupation as "police officer."

b. Thirty of the CTRs were filed for currency deposits which occurred at the Bank of Bartlett. The CTRs described the following deposits of currency into a Bank of Bartlett bank account named "D & A Inc." at 4202 Winchester Road, Memphis, TN 38118, listing the transactor as Harris and the owner as "D & A Inc." with an EIN of 54-2088373:

On March 17, 2004, Harris deposited $15,017 in currency.

On March 31, 2004, Harris deposited $10,388 in currency.

On April 6, 2004, Harris deposited $13,735 in currency.

On April 13, 2004, Harris deposited $15,796 in currency.

On April 27, 2004, Harris deposited $14,670 in currency.

On May 5, 2004, Harris deposited $18,346 in currency.

On May 12, 2004, Harris deposited $14,152 in currency.

On May 20, 2004, Harris deposited $15,824 in currency.

On May 27, 2004, Harris deposited $14,369 in currency.

On June 4, 2004, Harris deposited $13,853 in currency.

On June 17, 2004, Harris deposited $16,992 in currency.

On June 28, 2004, Harris deposited $16,504 in currency.

---

[2] Banks must file Currency Transaction Reports for any deposits of more than $10,000 in currency.

8

ORIGINAL

On July 8, 2004, Harris deposited $10,108 in currency.

On July 29, 2004, Harris deposited $10,643 in currency.

On August 10, 2004, Harris deposited $10,245 in currency.

On September 7, 2004, Harris deposited $11,040 in currency.

On September 20, 2004, Harris deposited $14,910 in currency.

On October 4, 2004, Harris deposited $10,402 in currency.

On November 12, 2004, Harris deposited $12,303 in currency.

On December 1, 2004, Harris deposited $11,061 in currency.

On December 13, 2004, Harris deposited $13,228 in currency.

On January 6, 2005, Harris deposited $11,500 in currency.

On January 14, 2005, Harris deposited $10,580 in currency.

On March 18, 2005, Harris deposited $14,282 in currency.

On April 6, 2005, Harris deposited $12,560 in currency.

On May 6, 2005, Harris deposited $11,263 in currency.

On May 27, 2005, Harris deposited $10,355 in currency.

On August 1, 2005, Harris deposited $13,043 in currency.

On September 7, 2005, Harris deposited $11,959 in currency.

On September 26, 2005, Harris deposited $10,305 in currency.

c.  Another CTR was filed by the City of Memphis Credit Union for a currency deposit of $11,786 that occurred on June 10, 2004.  The CTR described the transaction as a deposit into an account (account number 27808) held at the City of Memphis Credit Union.  The CTR further described that the deposit was made on the behalf of "Terrence Harris, 1463 Pope St., Memphis, TN 38108."  The CTR also listed Harris' occupation as "MPD" and it listed his social security number and date of birth.

9

ORIGINAL

d. Lastly, a CTR was filed by the Bank of America for a currency deposit of $11,452 that occurred on February 23, 2006. The CTR described the transaction as a deposit into an account (account number 004442381985) held at the Bank of America. The CTR further described that the deposit was made on the behalf of "D&A, Inc., 8848 Sweet Flag Loop, Southhaven, MS 38671."[3] The CTR listed the same employer identification number (EIN: 54-2088373) as the CTRs filed by the Bank of Bartlett.

20.   An analysis of bank records (bank statements, deposit tickets and deposited items) obtained from the Bank of Bartlett pursuant to federal grand jury subpoenas revealed that approximately $835,422.70 in U.S. currency was deposited into the D&A, Inc. account from March 2004 through September 2005 (an average of $43,969.62 per month). Checks deposited into the account for the same time period were only $100,607.62, a majority of which appear to be non-revenue deposits for the business (including checks from Harris, his partner in D&A, Inc., an insurance company, etc.). Additionally, the mailing address for the bank account during this time period was P.O. Box 300163, Memphis, TN 38116 (through approximately November 30, 2004) and 8848 Sweet Flag Loop E., Southaven, MS 38671-5095 (Harris' residence) (from approximately December 1, 2004 through, at least, February 1, 2006). The bank records show Terrance Harris as the "President" of D&A, Inc.

21.   Additional information concerning Harris' cash transactions was obtained from two other informants (CS #3 and CS #4) on July 21, 2004. They reported to MPD Detective Russ Tilton and another officer that Harris had a plasma television set repaired at a TV repair shop in Memphis and that he paid cash for the $1,901.02 repair bill. Harris told them that there was no warranty because he bought the television "off the street." They described the cash payment as follows:

---

[3] As discussed in this affidavit, this is Harris' residence.

ORIGINAL

a. Harris picked up the television from the repair shop on June 26, 2004. The following occurred when Harris paid the bill. Harris opened up the trunk of the Mercedes he drove there and removed a white, paper Dixie Queen bag containing U.S. currency. There were three other bags like that one in the trunk. Inside the repair shop, Harris gave the bag of money to CS #4. According to CS #4, the money was broken down into separate bundles wrapped up in Domino pizza napkins. CS #4 could not remember how much money was in each bundle. CS #3 provided one of the investigators, Det. Russ Tilton, with one of the pizza napkins. Written in black magic marker on the napkin CS #3 gave Det. Tilton was "7/9/4" over "1300 T.C.". On the other side, by the Domino's logo, was "310" written in black pen. These notations appear to be a home-made code, and the circumstances suggest that the cash was derived from a cash-producing illegal source rather than a legitimate business.

b. CS #4 counted out the money. He/she said there were two $100.00 bills, $200.00 in twenties, $560.00 in tens, and the rest in one dollar bills. Harris then left with the TV. The investigators obtained the repair invoice, and it listed as the customer "Officer T.L. Harris, 1060 Twinkle Town Road, Memphis, Tennessee 38116."[4] The invoice showed that Harris paid cash in the amount of $1,901.02 for repair on a Gateway plasma television (model number GTWP42M203) on June 26, 2004. A new Gateway plasma television sold for either $2,800 or $4,500 in 2004 (depending on the model purchased).

### Real Estate Purchases by Officer Harris

22.     The Desoto County, Mississippi Tax Assessor's Office shows that Harris owns a residence located at 8848 Sweet Flag Loop East, Southaven, Mississippi 38671 (Assessor's

---

[4] This is the same address listed in the County Assessor's office as the address of the co-owner of 4202 Winchester. A credit reporting database reported that Harris' address was 1060 Twinkle Town Road, Memphis, Tennessee 38116 as of March 2004. As discussed in this affidavit, Harris is using multiple addresses.

11

ORIGINAL

Parcel Number1084200700002600).  A trust deed filed in June 2004 in Desoto County shows that Harris financed $200,355 through Homecomings Financial.  Records obtained from Homecomings Financial (pursuant to a federal grand jury subpoena) show that the contract price for the home was $210,900, so Harris paid at least $10,545 as a down payment on the property on or about June 10, 2004.  This property was listed in Harris' Chapter 7 petition (described above), and was identified as Harris' address in the petition.

23.    The Shelby County, Tennessee Register's Office shows that Harris, along with another individual, purchased 4202 Winchester Road, Memphis, Tennessee on January 21, 2003, for $150,000.  This property was listed in Harris' Chapter 7 petition (described above).  The Register's Office records also show that Harris and the co-owner financed only $112,500 (meaning that Harris and the co-owner paid $37,500 for a down payment).  Additionally, records from the Shelby County, Tennessee Assessor of Property's Office show that there was a building permit obtained on February 20, 2004 for the property showing that costs associated with the permit totaled $191,530.  The Register's Office shows only one lien that appears to be associated with the permit which was filed by ENSCOR, LLC on February 24, 2004 for $8,150 in materials and $918 in filing fees (for the lien).  The Register's Office does not show any additional mortgage on the property or any other lien on the property but the original financed amount of $112,500 and lien filed by ENSCOR, LLC.

<u>Vehicle Purchases by Officer Harris</u>

24.    State of Tennessee records show Terrance Harris has been the registered owner of two Mercedes automobiles, both with the same vehicle tag, QQJ284.  Neither vehicle was listed in the bankruptcy petition described above. Both registrations expired on May 31, 2005.

a.  A 2000 Mercedes Benz S Class S43OV was registered to Harris at 5045 Peartree Cove, Memphis, Tennessee 38125.  5045 Peartree Cove is shown as Harris' address in Memphis Police Department records.

12

ORIGINAL

b. A 2001 Mercedes Benz E Class E43OW was registered to Harris at 3075 Champions Dr., Apt 204, Arlington, TN 38002-5834.

25. State of Tennessee records also show that a 2001 Chevrolet Corvette is registered to Harris. The registration shows the address for Harris as 1463 Pope Street, Memphis, Tennessee 38108. Harris' 1997 employment application with the Memphis Police Department listed 1463 Pope Street, Memphis as his address. As discussed above, Harris also stated that this was his address in tax returns filed in 2002, 2003, and 2004.

26. State of Tennessee records also show that a 2003 Hummer is registered to Harris. The registration shows the address for Harris as 5045 Peartree Cove, Memphis, Tennessee 38125.

### Overall Conclusions Concerning the Financial Evidence

27. An analysis of the available financial documents pertaining to Harris reveals that he has been acquiring assets and living beyond the means afforded by any apparent legitimate means of income. The discrepancy between Harris' reported legal income and his lifestyle expenditures, multiple business ventures and cash transactions indicates that he is involved in some form of illegal activity that generates large sums of cash, such as narcotics trafficking. And, he is apparently using the Dixie Queens as a means of explaining the very large amounts of cash being deposited into accounts he controls.

### V.

### THE UNDERCOVER OPERATION WHICH PRODUCED ADDITIONAL EVIDENCE – INCLUDING RECORDINGS – OF OFFICER HARRIS' INVOLVEMENT IN CRIMINAL ACTIVITY

28. In 2006, the investigators were able to utilize an informant to further investigate Harris' involvement in criminal activity. The informant (CS #5) is a defendant in a pending criminal case in the United States District Court for the Western District of Tennessee. The

13

ORIGINAL

informant has pleaded guilty to conspiring to distribute cocaine and to violating the conditions of his supervised release imposed during an earlier federal drug case. He is awaiting sentencing and is cooperating with the investigators with the hope that this cooperation will be taken into account at sentencing.

29.    Under the supervision of the investigators, CS #5 had several telephone conversations and meetings with Harris, and these contacts were recorded. During these encounters, Harris engaged in the following criminal activity:

a. Harris attempted to recruit CS #5 to participate in a loan fraud scheme. The scheme involved purchases of real estate which would be financed through loans obtained through false representations to financial institutions. Harris stated that he planned to utilize the equity in the real estate acquisitions to obtain funds to invest in other ventures.

b. Harris gave CS #5 $5,000 with the understanding that this money would be used to purchase cocaine and that after the cocaine was sold Harris would receive back his investment plus a profit.

c. Harris assisted CS #5 in transporting what Harris believed to be six kilograms of cocaine from Memphis to a town near Jackson, Tennessee.

## Officer Harris' Real Estate Financing Scheme

30.    In January 2006, CS # 5 reported to the investigators that he was acquainted with Harris and that he suspected Harris was involved in illegal activity because Harris had more vehicles and business ventures than could be explained by his government salary. CS #5 said that Harris had approached him concerning going into a business venture together. During a conversation on January 13, 2006, Harris told CS #5 that he was looking at investment properties to purchase. Harris stated that he would do the transaction in the name of one of his "investors." Harris stated that he would use cash to purchase the property. He said that the property should cost him no more than $11,000 to $15,000, and that the property should appraise for $60,000.

14    ORIGINAL

Harris was apparently referring to a scheme in which he would use a nominee to purchase property and then use an inflated appraisal to dispose of the property at a profit. Harris wanted to split the cost of the property with a partner. Harris also indicated that he expected an excessive profit: he said he would not let $5.00 keep him from making $15.00.

31.    On February 4, 2006, under the investigators' supervision, CS #5 had several telephone conversations with Harris concerning the loan scheme. The conversations were recorded, and your affiant has reviewed the recordings.

a. In one call, CS #5 asked Harris what he planned to do with the real estate investments. Harris explained that he planned to take the equity out of the houses and "jump start the other business" [time marker 3:52].[5] Harris said that this other business was a trucking business. Harris said he wanted to buy four or five trucks. Harris also said he had an interest in a "club."

b. In another call, CS #5 and Harris discussed who would be used as the nominee purchaser. They discussed a plan to create false evidence of employment for the nominee. Harris said that, "we use Dixie Queen" and said that he would have his payroll people create checks or check stubs for the nominee [time marker 1:10].

### Officer Harris' Investment in a Cocaine Transaction

32.    During the second and third week of February, 2006, CS#5 and Harris, in a series of recorded telephone calls, discussed a proposal for Harris to contribute money to a venture by CS#5, with the understanding that CS#5 could return a quick and significant profit to Harris. Although drugs were not mentioned specifically, the insinuation by CS#5 through code was that the money would be used for a drug transaction.

---

[5] The references to the time are to the number of minutes and seconds from the beginning of the recording.

15

ORIGINAL

33. On February 22, 2006, under the investigators' supervision, CS #5 met with Harris in a parking lot near 5112 Park Avenue, Memphis. The meeting was recorded, and your affiant has reviewed the recording.[6] Harris gave $5,000 to CS #5. CS #5 commented that Harris would receive a $2,500 profit on his $5,000 investment and asked he would be willing to put up money for additional drug purchases.

34. Specifically, during the February 22 meeting, CS #5 asked Harris if he would be willing to participate in purchases of cocaine in Texas. Harris promptly agreed. CS #5 said that "we can make about three good moves with the [expletive] white" (referring to cocaine), and Harris replied, "let's go, what you waitin' on." Harris also said, "[expletive] three, need to make about four or five trips to get them. ... I'm ready to rock and roll with it, man." Harris asked how much profit could be expected from three trips to Texas. CS #5 replied, "depends on ... how many [expletive] keys we can get in that [expletive] per trip" (referring to how many kilograms of cocaine they could fit in the vehicle). CS #5 also assured Harris that there would be little risk since if they were stopped Harris would simply have to show his police credentials and in any event the drugs would be in a hidden compartment in the vehicle.

35. Harris and CS #5 also discussed the need to make sure that they were purchasing high quality drugs. CS #5 told Harris that he would make sure it was "white flake" (referring to cocaine). CS #5 also discussed with Harris the fact that a lot of customers "cook it up" (convert it to crack cocaine) and CS #5 need to make sure that the cocaine sold to them was not diluted.

36. Harris and CS #5 also discussed the need to avoid detection of their operation and to limit the number of people who knew about it. Harris suggested using Nextel telephones during the trips because communications over the walkie-talkie feature could not be detected.

---

[6] To assist in preparing this affidavit, DEA Task Force Officer Keith Watson also reviewed the recording of the February 22 meeting.

16

ORIGINAL

37.    During the February 22 meeting, Harris also discussed his plans to start a trucking business.  At one point, Harris suggested that drugs could be hidden in the wheel wells of the trucks.

38.    During the February 22 meeting, Harris indicated that he had prior experience in drug transactions.  Harris assured CS #5 that he had "spots" to store drugs, and he described a female acquaintance who had stored drugs for him in the past.  Harris said he that had "ran up on some candy" (obtained some drugs), he had called her, gave her the drugs and told her that, "you need to take this and keep it 'till l get back with you."  Harris said he gave her a "half slab" (possibly referring to a half kilogram).  Harris commented that she was willing to meet him to do this in "broad daylight."

39.    During the February 22 meeting, Harris also described to CS #5 a movie about a drug dealer who had made $300 million at a young age.  Harris offered to lend CS #5 a copy of the movie.

40.    On February 27, 2006, under the investigators' supervision, CS #5 met with Harris near the intersection of White Station and Park Avenue in Memphis.  The meeting was recorded, and your affiant has reviewed the recording.  The meeting was for the purpose of CS #5 repaying Harris the $5,000 and paying him an additional $2,500 in profit from the sale of the cocaine.  CS #5 counted the money as Harris watched and gave him $7,500 in currency.  CS #5 told Harris that, "I ain't getting nothing but three keys at a time.  I made 2,000 off each one of them."  CS #5 was telling Harris that he bought three kilograms of cocaine and resold them for a $2,000 profit on each kilogram.  CS #5 thanked Harris for helping to finance the transaction.

<u>Officer Harris Assisting in the Transportation of Cocaine</u>

41.    During the February 27, 2006, meeting, CS #5 also told Harris that he had "another deal."  CS #5 said that, "I got a partner coming down from Nashville ... He's going to get six keys" (referring to six kilograms).  CS #5 asked Harris to ride with him to the meeting

17

ORIGINAL

place near Jackson, Tennessee, and he promised to pay Harris. CS #5 told Harris that, "I can give you 500 off each key; that be 3000 " (meaning that Harris would be paid $3,000 for helping to transport six kilograms of cocaine to the purchaser from Nashville). Harris agree and asked that he be given one day notice before the deal.

42.    On March 2, 2006, under the investigators' supervision, CS #5 met with Harris near the intersection of Sycamore View and Macon Cove in Memphis. The meeting was recorded, and your affiant has reviewed the recording. Before the meeting, the investigators had given CS #5 $3,000 to pay to Harris and had placed six kilograms of sham cocaine in the rear storage compartment in the van being used by CS #5. When Harris arrived, he got into the van, and CS #5 drove the van to a nearby car wash. Once parked, Harris removed the packages of sham cocaine from the compartment and placed them in a bag and left the bag in the rear of the van.[7]

43.    Harris and CS #5 then traveled in the van north on Interstate 40. Harris drove the van. During the trip, CS #5 paid the $3,000 to Harris. Harris also offered to help CS #5 obtain a firearm.

44.    Harris and CS #5 went to a truck stop in Wildersville, Tennessee. There, they met the supposed drug purchaser (actually a DEA agent acting undercover). CS #5 gave the bag containing the sham cocaine to the undercover agent. Harris and CS #5 then returned to Memphis.

## VI.

## CONCLUSION

45.    Based on your Affiant's experience, training, and the foregoing observations and facts, your Affiant believes that there is probable cause to believe that Terrance Lashun Harris

---

[7] A video recording was made of Harris transferring the packages to the bag.

18

ORIGINAL

attempted to possess with the intent to distribute at least approximately six kilograms of cocaine,

a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

Bryan B. Underwood
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before
me this _5_ th day of May, 2006

Jon P. McCalla

Honorable Jon Phipps McCalla
U.S. District Court Judge

19

ORIGINAL